_____
                                    )
ESMERALDA CARDOSO,                  )
                                    )
        Plaintiff,                  )
                                    )        Civil Action No.
        v.                          )        13-12296-FDS
                                    )
CAROLYN W. COLVIN,                  )
Acting Commissioner, Social Security)
Administration,                     )
                                    )
        Defendant.                  )
_____)


## MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION TO REMAND AND REVERSE AND DEFENDANT'S MOTION FOR AN ORDER AFFIRMING THE DECISION OF THE COMMISSIONER

**SAYLOR, J.**

This is an appeal of a final decision of the Commissioner of the Social Security

Administration denying the application of plaintiff Esmeralda Cardoso for Social Security

Disability Insurance ("SSDI") benefits. Cardoso contends that she has been disabled since July

12, 2009, after being injured at work. She has appealed the Commissioner's denial of her claim

on the ground that the decision is not supported by "substantial evidence" as required by 42

U.S.C. § 405(g). Specifically, Cardoso contends that the Administrative Law Judge ("ALJ")

erred by (1) misconstruing the medical evidence and the law, (2) by excluding evidence of her

visits to a chiropractor, and (3) by failing to give appropriate consideration to her complaints of

pain.

Pending before the Court is plaintiff's motion for an order reversing the decision of the

Commissioner and defendant's cross-motion for an order affirming the decision of the

Commissioner.  For the reasons stated below, the motion to affirm will be granted and the motion to reverse will be denied.

I.    **Background**

Plaintiff Esmeralda Cardoso was born on July 10, 1965.  (A.R. at 127).  She is currently 48 years old.  (*Id.*).  She attended school as far as the eighth grade in Cape Verde.  (A.R. at 33-34).  In the past, she has worked as an assembler, a certified nursing assistant ("CNA"), and a stitcher.  (A.R. at 19).  She was working as a CNA when the injury at issue occurred.  (A.R. at 198).

    A.    **Injury and Medical Evidence**

Cardoso injured her back on July 12, 2009.  At the time, she was preventing a patient from falling while working as a CNA.  (*Id.*).  She felt severe pain in her back that forced her to stop working for the day.  (A.R. at 234).  The following day, July 13, she went to Braintree Rehabilitation Hospital, complaining of sharp and intermittent pain to the lumbar area.  (A.R. at 198).  She reported that the pain caused her some difficulty sleeping, and that bending and twisting increased the pain.  (*Id.*).

On examination, Cardoso had a normal stance and a slightly antalgic gait.  (*Id.*).[1]  She had moderate tenderness, but no palpable spasm in the lower back spinal muscles.  (*Id.*).  The lower extremity examination suggested normal sensation, with no straight-leg raise sign or Patrick's sign.  (*Id.*).[2]  She was instructed to use ice to reduce swelling, and was prescribed

---

[1] An antalgic gait is one that is altered in an effort to minimize pain.  *See* STEDMAN'S MEDICAL DICTIONARY 65, 91 (25th ed. 1990).

[2] Pain down the back of the leg below the knee when the injured leg is raised is a positive result in the straight-leg raise test, indicating possible nerve compression.  Sanford Health, *Straight Leg Test for Evaluating Low Back Pain*, SANFORD HEALTH, http://www.sanfordhealth.org/healthinformation/healthwise/topic/hw47310 (last

Naprosyn and Flexeril. (*Id.*).[3] Cardoso was also started in physical therapy and was told that she could do restricted work. (*Id.*)

On July 29, 2009, Cardoso returned to Braintree Rehabilitation Hospital. (A.R. at 199). She complained of continuing lower back pain, occasionally radiating toward the middle of her back. (*Id.*). She had a normal stance and gait, and moderate tenderness without palpable spasm in the lower back muscles. (*Id.*). She also had increased pain and increased lumbar lordosis, or curvature of the spine. (*Id.*). The lower extremity examination showed normal sensation and no straight-leg raise sign. (*Id.*). She had not begun physical therapy due to a vacation, but was scheduled for an evaluation the following day. (*Id.*). Her clinician advised her to continue her medications and that she could perform light duty. (*Id.*).

Cardoso returned to Braintree Rehabilitation Hospital for a third time on August 5, 2009. (A.R. at 200). She complained of pain throughout her back, concentrated on her lumbar area. (*Id.*). She had tenderness to moderate palpitation throughout her back, again most prominent in the lumbar muscles. (*Id.*). The lower extremity examination was mostly normal, except that she had increased lumbar pain with straight-leg raising. (*Id.*). Again, the clinician advised her that she could do light duty and should continue physical therapy. (*Id.*). The clinician also recommended a second opinion from a physiatrist. (*Id.*).

Cardoso underwent a physiatry evaluation with Dr. Janet Limke on August 13, 2009, at

---

visited June 6, 2014). Patrick's test is used to diagnose sacroiliac disease, which is trauma to the sacroiliac joint found in the pelvis. STEDMAN'S MEDICAL DICTIONARY 1572 (25th ed. 1990).

[3] Naprosyn is a brand of naproxen, an anti-inflammatory drug prescribed to treat pain, tenderness, swelling and stiffness. *See* Nat'l Inst. of Health, *Naproxen*, MEDLINEPLUS, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681029.html (last visited on June 5, 2014). Flexeril is a brand of the muscle relaxant cyclobenzaprine, often prescribed to relax muscles and relieve pain and discomfort. *See* Nat'l Inst. of Health, *Cyclobenzaprine*, MEDLINEPLUS, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682514.html (last visited on June 5, 2014).

Braintree Rehabilitation Hospital.  (A.R. at 201).  She complained that her back pain was

unimproved despite taking her medications and completing five sessions of physical therapy.

(*Id.*).  She also stated that she recently ran out of medication and that her back pain was a five to

seven on a ten-point scale in intensity.  (*Id.*).  She further complained that she had difficulty

sleeping, and recalled a previous back injury that she suffered after a motor vehicle crash years

ago.  (*Id.*)  She contended that she had been fully recovered from this before her back injury on

July 12, 2009.  (*Id.*).  During her physical examination, lumbar flexibility was limited by pain to

seventy degrees forward bending, fifteen degrees extension, and twenty degrees side bending in

each direction.  (*Id.*).  Her walk was slow with a non-antalgic gait.  (*Id.*).  Her lower extremity

strength was restricted by poor effort do to her back pain, but no focal weakness was indicated.

(*Id.*).  Straight-leg raise aggravated the pain at approximated fifty degrees, and seated straight-

leg raise was negative.  (*Id.*)

Dr. Limke concluded that Cardoso likely had an annular tear or disc protrusion without

signs of neurologic impairment.  (*Id.*).[4]  Dr. Limke assured her that she could safely work

through pain in order to restore function to the spine, and that her condition would improve with

time and progressive exercises.  (*Id.*).  Dr. Limke prescribed a prednisone taper and renewed her

prescriptions for Flexeril and Naprosyn.  (*Id.*).[5]  She told Cardoso that she believed it would be

safe for her to do light lifting up to ten pounds, and to do light tasks, before her next visit.  (*Id.*).

Dr. Limke encouraged the physical therapist to begin progressive lifting, even with very light

---

[4] A disc is the fibrocartilage tissue found between vertebrae.  STEDMAN'S MEDICAL DICTIONARY 443 (25th ed. 1990).  The annulus fibrosus is the outer part of the disc.  *Id.*

[5] Prednisone is a dehydrogenated analogue of cortisone, generally used for the same purposes.  STEDMAN'S MEDICAL DICTIONARY 1251 (25th ed. 1990).

weight.  (*Id.*).

Cardoso returned to see Dr. Limke on August 27, 2009.  (A.R. at 202).  She reported no significant improvements in her lower back pain despite having followed the prednisone taper. (*Id.*).  Further, she complained of significant pain radiation down her right leg.  (*Id.*).  She had made little progress in physical therapy, and the physical therapist had indicated significant pain behaviors with all activities.  (*Id.*).  A physical examination showed results similar to the previous one, except there was some decreased sensation on the right side of her back, and she reported mild discomfort on her right side when straight-leg raise was done to eighty degrees. (*Id.*).  Dr. Limke noted that she could only lift eighteen pounds with great effort at physical therapy.  (*Id.*).  Dr. Limke decided to proceed with an MRI scan of the lumbar spine.  (*Id.*).  Dr. Limke put physical therapy on hold in the interim, but did not change the work recommendations.  (*Id.*).

On September 10, 2009, Cardoso again returned to Dr. Limke after an MRI scan on September 2.  (A.R. at 203).  Dr. Limke noted that the MRI demonstrated spondylolysis without spondylolistheses on the L5 vertebra, central disc protrusion at L5-S1, disc bulging that mildly impinged on L5 nerve roots, and right disc protrusion at L4-5 contacting right L4 nerve roots.  (*Id.*).[6]  The physical examination indicated spinal motion limited to ninety degrees forward bending and fifteen-degree extension.  (*Id.*).  Dr. Limke concluded that she had low-back pain with radiation from the right lumbar region, and no signs of focal neurologic impairment.  (*Id.*)  He observed that lumbar deconditioning and central disc protrusion made it

---

[6]  Spondylolysis is a degeneration of a portion of the vertebra.  STEDMAN'S MEDICAL DICTIONARY 1456 (25th ed. 1990).  Spondylolisthesis is a condition when one vertebra slips forward on the vertebra below it.  *Id.*  Five bony segments fused together comprise the sacral region, and together create a bone at the base of the spine, and part of the pelvis.  Mayfield Clinic, *supra*.  L5-S1 is the segment where the lumbar spine and sacral region meet.  *See id.*

hard for her to lift and bend.  (*Id.*).

Dr. Limke assured Cardoso that it was safe to work through pain in order to restore spinal function, and encouraged her to continue physical therapy including progressive lifting and spine conditioning.  (*Id.*).  Dr. Limke also suggested spine steroid injections to break the pain cycle and help her adapt to the change more quickly.  (*Id.*).  Finally, Dr. Limke told her to continue taking Naprosyn and Flexeril, and that she was able to work a light-duty position lifting ten pounds or less.  (*Id.*).

Dr. Limke saw Cardoso again on October 8, 2009, for a re-evaluation.  (A.R. at 204). She reported that she had seen little improvement in the pain as a result of therapy, and could only lift up to six pounds.  (*Id.*).  She showed small improvement on the physical examination, bending forward seventy degrees with pain, twenty degrees to each side, and extension to fifteen degrees.  (*Id.*).  Her strength was intact, and no calf atrophy was observed.  (*Id.*).  Dr. Limke's impression was low-back pain with underlying disc protrusion and no signs of neurological impairment.  (*Id.*).  She ordered an epidural steroid injection for the central disc protrusion.  (*Id.*). Cardoso declined and instead sought to obtain a second opinion and continue therapy.  (*Id.*).

Dr. Limke advised Cardoso to continue physical therapy.  She again advised that it was appropriate for her to continue working through the pain with strength training in order to restore spinal function.  (*Id.*).  She thought it not unreasonable to do a return-to-work trial in about one month, even if some symptoms remained.  (*Id.*).

Cardoso sought a second opinion from Dr. Raymond Pavlovich at Orthopedic Care Specialists on October 14, 2009.  (A.R. at 234).  She reported that her symptoms had initially been restricted to her lower back, but that the pain had since spread to her legs, primarily her

right. (*Id.*). Dr. Pavlovich's assessment was lumbar degenerative disease with chondrolysis of the L5 vertebra. (*Id.*).[7] He believed she was already on the correct medications. He discussed epidural steroid injections with her, and referred her to Dr. Anthony Wong to schedule injections. (A.R. at 235).

Cardoso returned to Dr. Limke on November 5, 2009. (A.R. at 205). She reported no significant change in her pain, and indicated that she would not proceed with the recommended epidural injection. (*Id.*). She showed no significant improvements in functional intolerance despite completing physical therapy, and was not able to demonstrate her exercise program for home use. (*Id.*). She reported that her prior job had not been able to accommodate her. (*Id.*). On physical examination, Dr. Limke noted that she had a hard time demonstrating exercises, exhibited a lot of pain behaviors even with simple movements, and provided limited effort with manual muscle testing of her lower extremities. (*Id.*). No fasciculations or atrophy were noted, and her gait was normal. (*Id.*).[8]

Dr. Limke's impression was chronic low-back pain with disc degeneration and history of strain injury. (*Id.*). She observed no significant neurological impairment, and concluded that Cardoso either had a limited understanding of what she should be doing on her own or was being noncompliant with her exercise program. (*Id.*). She recommended that Cardoso could return to work with occasional lifting up to twenty-five pounds, and frequent lifting up to ten pounds, even if her symptoms were ongoing. (*Id.*). She again prescribed Flexeril, and noted that she

---

[7] Chondrolysis is a condition where cartilage of a joint disappears. STEDMAN'S MEDICAL DICTIONARY 298 (25th ed. 1990).

[8] Fasciculations are involuntary contractions or twitching of groups of muscle fibers. STEDMAN'S MEDICAL DICTIONARY 567 (25th ed. 1990).

would be arranging future care with another physician.  (*Id.*).

Cardoso returned to Orthopedic Care Specialists on November 23, 2009, to see Dr. Wong.  (A.R. at 237).  She reported pain in her lower back, with an average of seven on a ten-point scale, but ranging from five to nine.  (*Id.*).  She reported the pain was exacerbated by walking, lifting, bending, lying, standing, or sitting.  (*Id.*).  Heat could somewhat alleviate the pain.  (*Id.*).  Dr. Wong's impression was not significantly different to that of Dr. Limke.  (A.R. at 238).  Because little improvement had been seen with conservative methods, he recommended lumbar epidural injections.  (*Id.*).

Cardoso received her first lumbar epidural steroid injection on December 22, 2009.  She returned to see Dr. Wong on January 14, 2010.  (A.R. at 240-241).  She noted that the first injection resulted in about one week of thirty percent benefit, and that the pain had since returned.  (A.R. at 241).  Dr. Wong suggested a lower extremity EMG to further evaluate the presence of radiculopathy.  (*Id.*).[9]

On March 1, 2010, Dr. Wong concluded that the EMG showed mild bilateral L4, L5 radiculopathy.  (A.R. at 243).  He assessed the radiculopathy as likely resulting from L5-S1 disk protrusion.  (*Id.*).  Cardoso agreed to schedule a second lumbar epidural steroid injection, which she received on April 20, 2010.  (A.R. at 243-245).

On May 20, 2010, in a follow-up visit after her second injection, Cardoso reported a thirty percent improvement in her pain, beginning one week after the procedure.  (A.R. at 246).  She also reported some improvement following additional physical therapy visits.  (*Id.*).  At a visit on June 14, 2010, however, she complained that her pain was slowly returning.  (A.R. at

---

[9] Radiculopathy a disease of the spinal nerve roots.  STEDMAN'S MEDICAL DICTIONARY 1308 (25th ed. 1990).

248).  However, she had been continuing limited physical therapy, and again admitted it had

helped her see some improvements.  (*Id.*).  She reported that she felt unfit to perform any job,

had difficulty with sustained standing and walking, and was unable to lift objects above ten

pounds without exacerbating her symptoms.  (*Id.*).  Dr. Wong recommended another injection.

(*Id.*).

On August 4, 2010, Dr. Wong noted that payment for repeat spinal injection procedures

was denied by worker's compensation.  (A.R. at 250).  Cardoso reported some improvement

following therapy and home exercises, but still felt unable to perform any job.  (*Id.*).  Dr. Wong

made some adjustments to her medication, and advised her to continue her home exercises.  (*Id.*).

Despite noting her descriptions of pain, he reported that he did not believe she was qualified for

total long-term disability.  (*Id.*).

Cardoso returned to Dr. Wong on September 15, 2010, after completing a functional

capacity examination at Braintree Rehabilitation Hospital.  (A.R. at 262).  Dr. Wong again

advised home stretching exercises, and concluded that having reached maximum benefits

through the pain center, she should consult Dr. Andrew White for possible surgical intervention.

(*Id.*).  On October 27, 2010, Dr. Wong adjusted her medications and noted that she had a

pending appointment with Dr. White.  (A.R. at 264).  He also noted that he did not think she

could return to her prior employment given her symptoms, but believed that there was some

gainful employment that she could perform with certain restrictions.  (*Id.*).

On October 19, 2010, Dr. Richard Aubry reviewed the medical evidence of Cardoso's

condition and made an assessment of her physical residual functional capacity.  (A.R. at 260).

He concluded that she could lift twenty pounds occasionally and ten pounds frequently.  (A.R. at

254).  He also concluded that she could stand and/or walk for about six hours in an eight-hour workday, sit for about six hours in an eight hour workday, and that she was unlimited in other push and/or pull movement.  (*Id.*).  Dr. Aubry also concluded that she could occasionally climb, balance, stoop, kneel, crouch, and crawl.  (A.R. at 255).[10]

Cardoso saw Dr. White on November 9, 2010, for an assessment.  (A.R. at 266).  On November 16, 2010, after reviewing Cardoso's symptoms and the results of an MRI, Dr. White concluded that she likely had L5-S1 spondylolisthesis with neurological symptoms unresolved by conservative care.  (A.R. at 270).  He reported that she expressed interest in surgical treatment, and noted that this choice was a reasonable one.  (*Id.*).

On May 16 and 19, 2011, Cardoso underwent anterior and posterior lumbar interbody fusion on the L5-S1 segment.  (A.R. 280-292).  When discharged on May 22, Dr. White instructed her to lift no more than ten pounds for the following two weeks.  (A.R. at 282).  He advised her that she would be more comfortable if she did not sit or stand for more than forty-five minutes without walking.  (*Id.*).  Dr. White further advised Cardoso to walk at least for fifteen to thirty minutes two to three times a day, and that she could walk as much as she could tolerate.  (*Id.*).

After surgery, Cardoso returned for a follow-up on July 26, 2011.  (A.R. at 278).  She reported a complete resolution to her lower extremity symptoms, with some back pain remaining.  (*Id.*).  She also noted the back pain was resolving slowly, and responding well to Oxycodone.  (*Id.*).  On physical examination, her wounds were well healed, her calves were not tender, and straight-leg raises were negative.  (*Id.*).  Cardoso said that she was very happy with

---

[10] This conclusion was affirmed by Jane Matthew, M.D., on February 15, 2011, after reviewing the medical evidence.  (A.R. at 275).

the results.  (*Id.*).  Dr. White advised her to maintain her activity restrictions and he refilled her prescription.  (*Id.*).

Cardoso returned for another follow-up on October 18, 2011.  (A.R. at 277).  She reported some return of back pain, after months of no pain.  (*Id.*).  She was doing no physical therapy, had not returned to work, and denied any inciting incidents.  (*Id.*).  Dr. White noted that her conditions were generally consistent with healing spinal fusion.  (*Id.*).  He prescribed physical therapy to help with the pain.  (*Id.*).  Dr. White expressed that there should be no activity restrictions after six months from the surgery, and that he expected her to be able to return to work at that time.  (*Id.*).

**B.    Non-Medical Evidence**

Antonia DePina, a friend of Cardoso's, completed a functional report on her behalf on September 27, 2010.  (A.R. at 130, 157).  Cardoso reported that in a typical day, she would shower, eat breakfast, watch the news, sit for periods of twenty or thirty minutes, and stand and walk sometimes.  (A.R. at 150).  She reported that her pain affected her ability to dress and wash her feet.  (A.R. at 151).  She reported that she would prepare sandwiches and other meals for herself, but that her cooking habits had been affected by her injury.  (A.R. at 152).  She contended that she was unable to do any household chores, either indoors or outdoors.  (*Id.*).  She reported that she could drive and go out alone, but brought her daughters when shopping for food.  (A.R. at 153).  In addition, she reported that she went to church on Sunday.  (A.R. at 154).  Finally, she reported that her injury affected her ability to lift, squat, bend, stand, walk, sit, kneel, and climb stairs.  (A.R. at 155).

On January 17, 2012, Cardoso testified at the hearing before the ALJ.  (A.R. at 26).  She

contended that during the period Dr. Wong was giving her shots her back had been burning, and she had pain in both legs. (A.R. at 35-36). She also testified that her symptoms did not improve after working with a chiropractor. (A.R. at 36). She testified she could sit for more than half an hour, stand for fifteen minutes, and walk for ten. (A.R. at 37). When asked if her back had improved following surgery, she responded, "yeah, for a little, not much." (*Id.*). She then testified that at the time of the hearing the pain in her back made household tasks difficult, and that she spent most of the day standing up, sitting down, and walking around the house. (A.R. at 50-51). She testified that her back prevented her from returning any of her previous jobs as a CNA, assembler, or stitcher. (A.R. at 41-42).

Robert Laskey, a vocational expert, also testified at the hearing. (A.R. at 44). He testified that a person with the limitations described in Cardoso's residual functional capacity report would be able to work as either an assembler or as a stitcher. (A.R. at 45-46). However, when asked to also consider her statements of her pain, Mr. Laskey stated that he did not believe she could work in a full-time basis in any occupation. (A.R. at 46). At the hearing, the ALJ granted her permission to submit the results of an MRI and CAT scan, which had both been conducted on January 9, 2012. (A.R. at 27, 298-301). Those showed evidence of the surgery, as well as mild disc bulging between the L4 and L5 vertebrae. (A.R. at 298-301). The ALJ did not accept records of Cardoso's chiropractic treatment, as they were not submitted on time, and the treatment had ended in February 2011. (A.R. at 27).

## II.    Procedural History

Cardoso initially filed for SSDI on August 6, 2010, claiming disability beginning July 12, 2009. (A.R. at 109). Her application was denied initially and upon reconsideration. (A.R. at

11).  After a hearing on January 17, 2012, the ALJ issued a decision on January 27, 2012, finding

that Cardoso was not disabled from the alleged onset through date of the decision.  (A.R. at 11-

20).  On August 20, 2013, the Appeals Council denied Cardoso's request for review.  (A.R. at 1).

## III.    Analysis

### A.       Standard of Review

Under the Social Security Act, this Court may affirm, modify, or reverse the final

decision of the Commissioner, with or without remanding the case for a rehearing.  42 U.S.C. §

405(g). The denial of social security disability benefits must be upheld if it is supported by

substantial evidence and the Commissioner has applied the correct legal standard.  42 U.S.C. §

405(g); *Manso-Pizzaro v. Sec'y of Health and Human Servs.*, 76 F.3d 15, 16 (1st Cir. 1996).

The Commissioner's factual findings are conclusive "if supported by substantial evidence."  42

U.S.C. § 405(g).  The Commissioner, and not the reviewing Court, is responsible for "weighing

conflicting evidence, where reasonable minds could differ as to the outcome."  *Seavey v.

Barnhart*, 276 F.3d 1, 10 (1st Cir. 2001).  Therefore, this Court must accept the factual findings

of the Commissioner "if a reasonable mind, reviewing the evidence in the record as a whole,

could accept it as adequate to support his conclusion," even where the record could justify a

different conclusion.  *Rodriguez v. Sec'y of Health and Human Servs.*, 647 F.2d 218, 222 (1st

Cir. 1981); *see also Evangelista v. Sec'y of Health and Human Servs.*, 826 F.2d 136, 144 (1st

Cir. 1987).   This courts review of the Commissioner's decision "is limited to determining

whether the [Commissioner] used the proper legal standards, and found facts based on the proper

quantum of evidence."  *Ward v. Comm'r of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir. 2000).

Questions of law, to the extent that they are at issue in this appeal, are reviewed *de novo*.

*Seavey*, 276 F.3d at 9.

**B.      Standard for Entitlement to SSDI Benefits**

An individual is not entitled to SSDI benefits unless she is "disabled" within the meaning

of the Social Security Act.  *See* 42 U.S.C. § 423(a)(1)(A), (d) (setting forth the definition of

disabled in the context of SSDI).  "Disability" is defined, in relevant part, as the "inability to

engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

The impairment must be severe enough to prevent the plaintiff from performing not only past

work, but any substantial gainful work existing in the national economy.  42 U.S.C. §§

423(d)(2)(A), 1382c(a)(3)(B); 20 C.F.R. §§ 404.1560(c)(1), 416.960(c)(1).

The Commissioner uses a sequential five-step process analysis to evaluate whether a

claimant is disabled.  *See* 20 C.F.R. § 404.1520.  The steps are:

> 1) if the applicant is engaged in substantial gainful work activity, the application is
> denied; 2) if the applicant does not have, or has not had . . . a severe impairment or
> combination of impairments, the application is denied; 3) if the impairment meets the
> conditions for one of the 'listed impairments' in the Social Security regulations, then
> the application is granted; 4) if the applicant's 'residual functional capacity' is such
> that [s]he . . . can still perform past relevant work, then the application is denied; 5)
> if the applicant, given his or her residual functional capacity, education, work
> experience, and age, is unable to do any other work, the application is granted.

*Seavey*, 276 F.3d at 5; *see* 20 C.F.R. § 404.1520(a)(4).[11]  "The applicant has the burden of

production and proof at the first four steps of the process," and the burden shifts to the

Commissioner at step five to "com[e] forward with evidence of specific jobs in the national

---

[11] "All five steps are not applied to every applicant, as the determination may be concluded at any step
along the process."  *Seavey*, 276 F.3d at 5.

economy that the applicant can still perform." *Freeman v. Barnhart*, 274 F.3d 606, 608 (1st Cir. 2001). At that juncture, the ALJ assesses the claimant's RFC in combination with the "vocational factors of [the claimant's] age, education, and work experience," 20 C.F.R. § 404.1560(c)(1), to determine whether he or she can "engage in any . . . kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

C.    **The ALJ's Findings**

The ALJ followed the five-step procedure set forth in 20 C.F.R. § 404.1520(a)(4) to determine whether plaintiff had been under a disability from August 30, 2008, her alleged disability onset date, through the date of the decision. (A.R. at 13-14).

At step one, the ALJ found that the plaintiff has not engaged in substantial gainful activity since July 12, 2009, the alleged onset date. (A.R. at 13).

At step two, the ALJ found that plaintiff had the following severe impairments: degenerative disc disease of the lumbar spine, lumbar radiculopathy with spondylolisthesis, and status post interior lumbar interbody fusion/posterior fusion at the L5-S1 level. (*Id.*)

At step three, the ALJ determined that the plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (A.R. at 14). In reaching this conclusion, the ALJ specifically considered the criteria regarding spine disorders. (*Id.*). In addition, the ALJ considered the opinions of state agency medical consultants that had evaluated the issue and reached the same conclusion. (*Id.*).

The ALJ then proceeded to the fourth step, considering plaintiff's residual functional capacity to perform the requirements of her past relevant work. (A.R. at 13). The ALJ

considered all of plaintiff's symptoms "to the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," as well as opinion evidence. (A.R. at 14). The ALJ concluded that plaintiff "has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that she can only occasionally climb, balance, stoop, kneel, crouch, or crawl." (*Id.*). In making that finding, the ALJ found that plaintiff's medical impairments could reasonably be expected to cause the alleged symptoms. (A.R. at 15). However, he found that the plaintiff's statements concerning the intensity, persistence, and limiting effects of the symptoms were not credible to the extent that they were inconsistent with the residual functional capacity assessment. (*Id.*).

The ALJ reviewed the medical record dating back to the alleged onset date, and weighed both objective and subjective evidence. (A.R. at 15-19). First, he found that the objective evidence was not entirely consistent with plaintiff's claims of impairment. (A.R. at 16). He then considered the subjective evidence regarding plaintiff's symptoms, and concluded that it was consistent with his RFC finding, and inconsistent with plaintiff's claims of impairment. (A.R. at 17). Finally, the ALJ considered the findings of Dr. Wong, Dr. White, Leslie Collins (a physical therapist), and Dr. Aubry. (A.R. at 18).[12] In sum, the ALJ considered objective, subjective, and opinion evidence, and found that as a whole, the record supported his finding as to plaintiff's RFC. (A.R. at 15-19).

Finally, the ALJ concluded that plaintiff was capable of performing past relevant work as an assembler and as a stitcher. (A.R. at 19). That conclusion was based on the opinion given by

---

[12] The ALJ recognized that Leslie Collins was not an "acceptable medical source" under Social Security regulations, but gave her opinion some weight as to plaintiff's level of impairment and ability to function, consistent with Social Security Ruling 06-03p. (A.R. at 18).

the vocational expert at the hearing as to the abilities of a person with same age, education, work experience, and the same RFC as the ALJ found plaintiff to have. (A.R. at 19).

### D. **Plaintiff's Objections**

Plaintiff raises three issues in this appeal. She contends that the ALJ erred by (1) misconstruing the medical evidence and the law, (2) excluding the chiropractic notes she offered at the hearing, and (3) failing to give appropriate consideration to her complaints of pain.

### 1. **The ALJ's Construction of the Evidence and the Law**

Plaintiff contends that the ALJ misconstrued the evidence and the law. First, she contends that the ALJ misinterpreted the statements made by her examining doctors. She contends that the ALJ gave great weight to the fact that Dr. Limke said plaintiff "could return to work in a light duty capacity," and that Dr. Pavlovich concluded that she could "return to work" with certain lifting restrictions. She maintains that the ALJ's analysis is problematic because Dr. Limke was evaluating her in the context of a worker's compensation case, and therefore the statement is irrelevant to her ability to perform "light work" in the context of a claim for SSDI benefits. (20 CFR Part 404, Subpart P, App 2). Second, plaintiff argues that the ALJ's statement that Dr. Pavlovich "concurred with much of Dr. Limke's previous assessment" is misleading, because Dr. Pavlovich never suggested that she should return to light duty work. She further contends that the ALJ misconstrued the evidence in finding that her level of functioning in the record is consistent with the RFC determination because he mischaracterized her RFC report, making her appear more active than she really is.

Plaintiff also argues that the ALJ gave too much weight to Dr. Wong's comment in August 2009 that he did not believe that plaintiff qualified for total long-term disability. Finally,

she contends that the ALJ misconstrued the evidence by concluding that she received benefits from medical treatment.

Plaintiff's contention that the ALJ gave too much weight to Dr. Limke's note that she could return to light work duty, and Dr. Pavlovich's concurrence with "much" of that assessment, is not supported by the record. It is true that the ALJ did mention Dr. Limke's advice that plaintiff could return to work in a light-duty capacity. (A.R. at 15). However, the ALJ did not take that note as dispositive. (*Id.*). Rather, the ALJ mentioned it in his description of plaintiff's visit to Dr. Limke, and considered it consistent with other medical evidence in the record. (*Id.*). The ALJ also noted that Dr. Pavlovich "concurred with much of Dr. Limke's previous assessment," specifically noting that he too believed that epidural steroid injections could provide benefit to plaintiff. (*Id.*). The ALJ did not, as plaintiff alleges, explicitly or implicitly suggest that Dr. Pavlovich simply agreed with Dr. Limke's assessment regarding her ability to work. (*Id.*).

The ALJ's interpretation of plaintiff's RFC report is substantially accurate. The ALJ noted that plaintiff interacts with "friends" on a daily basis, where the report indicated that she spends time with "others" daily. That error was minor, and is not a distinction on which the ALJ heavily relied. Rather, he observed a substantial inconsistency between plaintiff's claims of disability and the conclusions of the report. (A.R. at 17). Furthermore, the ALJ found discrepancies between the range of daily activities described at the hearing and those that plaintiff had previously described. (*Id.*).

While much of plaintiff's testimony indicates limited improvement from medical treatment, the objective evidence in the medical record supports the inference that she obtained

improvements with medical care. It is the responsibility of the ALJ to draw inferences from the evidence, and the ALJ's conclusions when considering conflicting evidence should not be overturned as long as they are supported by substantial evidence. *See Ortiz v. Sec'y of Health and Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991). The ALJ observed that plaintiff had admitted to receiving benefits from physical therapy, epidural steroid injections, medication, and surgery. (A.R. at 16). While that evidence conflicts with plaintiff's testimony, and reasonable minds may differ as to the extent of the benefits, there is certainly substantial record evidence to support the inference that the ALJ made. *See Seavy*, 276 F.3d at 10.

As plaintiff alleges, the ALJ did give "great weight" to Dr. Wong's opinion that plaintiff cannot "return to her prior employment given her symptoms," but "that there is some gainful employment in the world that she may do with certain restrictions." (A.R. at 18). However, the ALJ gave weight to Dr. Wong's opinion because it was "consistent with the record as a whole" and because Dr. Wong's status "as a long-time treating source" put him in a good position to judge plaintiff's abilities and limitations. (*Id.*). Again, it is the responsibility of the ALJ, not this Court, to weigh evidence where reasonable minds could differ as the outcome. *Seavy*, 276 F.3d at 10. The ALJ explained his reasoning for crediting Dr. Wong's testimony. (A.R. at 18). He did not rely exclusively on that testimony and noted Dr. Wong's qualifications as well the fact that Dr. Wong's conclusions were consistent with the medical record. (*Id.*). Notwithstanding plaintiff's claims, the ALJ did not simply adopt Dr. Wong's assessment of her disability, but used it as one piece of evidence in making his decision, assigning such weight as he believed it warranted. (*Id.*).

Plaintiff also contends that the ALJ did not fairly consider the whole record.

Specifically, she contends that the ALJ relied heavily on Dr. White's post-surgery notes, while ignoring the MRI and CT scans taken after surgery. The ALJ in fact did address plaintiff's MRI and CT scans, but noted that there was no indication that she continued to participate in any form of ongoing treatment. (A.R. at 16). Because of the lack of post-surgical treatment record, the ALJ's only evidence of post-surgery impairment came from Dr. White's notes of examination and plaintiff's own testimony. The ALJ was entitled to find plaintiff's testimony not credible, if that conclusion was supported by substantial evidence. *Da Rosa v. Sec'y of Health and Human Servs.*, 803 F.2d 24, 26 (1st Cir. 1986). The ALJ noted Dr. White's report that plaintiff was doing well following her surgery, as well as his indication that there would be no activity restrictions after six months. (A.R. at 16). The ALJ further noted that plaintiff's alleged symptoms were not consistent with the medical record as a whole. (*Id.*). Again, this Court may not overturn the ALJ's weighing of the evidence or credibility decisions as long as there is there is substantial evidence to support them. *See Ortiz*, 955 F.2d at 769.

The ALJ properly considered all the evidence in the record from the alleged onset date until the day of the hearing. (A.R. 14-19). He gave more weight to some pieces of evidence than to others, but supported his evaluations of the evidence with appropriate reasons. (*Id.*). It is not the province of this Court to reverse the ALJ's findings of credibility, or require a different weighing of the evidence, simply because reasonable minds may differ. *Seavey*, 276 F.3d at 10. The ALJ therefore did not err in his evaluation of the evidence.

### 2.     Exclusion of Chiropractic Treatment Notes

Plaintiff next contends that the ALJ abused his discretion by not considering 15 pages of notes of her chiropractic treatment. The relevant regulation provides that any "written evidence

that you wish to be considered at the hearing must be submitted no later than five business days before the date of the scheduled hearing." 20 C.F.R. § 405.331(a). If that requirement is not met, then the ALJ may decline to consider the evidence unless an exception is met. 20 C.F.R. § 405.331(a). The regulation further provides that evidence offered after the deadline during the five days before the hearing, or at the hearing, will be accepted by the ALJ if the claimant shows that: (1) the Social Security Commission misled the claimant, (2) the claimant had a physical, mental, educational, or linguistic limitation that prevented her from submitting the evidence earlier, or (3) some other unusual, unexpected, or unavoidable circumstance beyond the claimant's control prevented her from submitting the evidence earlier. 20 C.F.R. § 405.331(b).

Plaintiff's attorney submitted the chiropractic notes on January 12, 2012, three business days before the hearing. (A.R. at 26). The chiropractic treatment had ended in February 2011, and plaintiff's attorney did not provide any justification sufficient to trigger the exceptions in 20 C.F.R. § 405.331(b). (A.R. 26-27). Because plaintiff did not establish that an exception to 20 C.F.R. § 405.331(a) applies, the ALJ did not err by refusing to admit the notes in evidence.

Plaintiff further contends that because the ALJ left the record open for her MRI and CT test results, that he should have also held the record open for the chiropractic notes. However, the ALJ acknowledged that the MRI and CT results were not yet available at the time of the hearing, and therefore an unavoidable circumstance beyond plaintiff's control was present. Such a condition requires the ALJ to waive the five-day rule. 20 C.F.R. § 405.331(b)(3); (A.R. at 27).

Finally, plaintiff contends that the Appeals Council erred by not considering the chiropractic treatment notes before declining her request for review. The Appeals Council must review a case if there appears to be an abuse of discretion by the ALJ, there is an error of law,

the findings of the ALJ are not supported by substantial evidence, or there is a broad  policy or procedural issue that may affect the general public interest.  20 C.F.R. § 404.760(a).  Plaintiff did not argue that this case falls into one of those categories, and there are no facts to indicate that it does.  (*Id.*).  However, where new and material evidence has been submitted, the ALJ must evaluate the entire record, including the new evidence to the extent it relates to the relevant time period.  20 C.F.R. § 404.760(b).  The Appeals Council must then review the case if it finds that the ALJ's action, findings, or conclusion is contrary to the weight of the evidence on the updated record.  (*Id.*).  In this case, plaintiff makes no showing that the chiropractic notes are sufficient to make the ALJ's findings contrary to the weight of the evidence.

Furthermore, 20 C.F.R. 405.401(c) provides that additional evidence submitted to the Appeals Council will only be considered if (1) the Social Security Commission misled the claimant, (2) the claimant had a physical, mental, educational, or linguistic limitation that prevented her from submitting the evidence earlier, or (3) some other unusual, unexpected, or unavoidable circumstance beyond the claimant's control prevented her from submitting the evidence earlier.  20 C.F.R. 405.401(c).  As discussed, plaintiff failed to demonstrate that any of those three categories applied.

In any event, even if the evidence had been omitted, the Appeals Council need only consider the new evidence if there is a "reasonable probability that the evidence, alone or when considered with the other evidence of the record, would change the outcome of the decision."  20 C.F.R. 405.401(c).  At the hearing before the ALJ, plaintiff's counsel advanced the chiropractic notes because they "just sort of fill[] in the gap" of plaintiff's treatment.  (A.R. at 27).  The ALJ did acknowledge the chiropractic treatment in his decision, and there is no indication that the

addition of the notes would give rise to a "reasonable probability" that the outcome of the decision would be reversed. In fact, the chiropractic notes are largely consistent with the rest of the record. For example, on January 31, 2011, the chiropractor noted that although plaintiff "does not seem to be progressing subjectively very much, her examination findings and especially her outcomes disability questionnaires reveal consistent progress throughout her care." (Pl.'s Ex. 1). Finally, the chiropractor's notes took place before Dr. White's examination and surgery on plaintiff, and would not have affected the ALJ's conclusions of plaintiff's condition subsequent to surgery. (A.R. at 16).

### 3.     Complaints of Pain

Finally, plaintiff contends that the ALJ did not properly evaluate her subjective complaints of pain because he focused on the period following her surgery and not on the entire period of time from the alleged onset to the date of the hearing. In his written decision, the ALJ considered plaintiff's allegations of pain in the record beginning with the onset of the injury. (A.R. at 15). In addition, he considered her current allegations of pain to the extent that he found them credible and consistent with the objective evidence. (A.R. at 14).

Furthermore, the ALJ explicitly considered subjective evidence when assessing credibility, including relevant factors such as (1) the plaintiff's daily activities, (2) the location, duration, frequency, and intensity of her pain or other symptoms, (3) factors that precipitate and aggravate symptoms, (4) medications she takes or has taken to alleviate pain or other symptoms, (5) other treatment that she has received for relief, (6) measures she has taken to relieve pain or other symptoms, and (7) and other factors concerning her functional limitations and restrictions. *See Avery v. Sec'y of Health and Human Servs.*, 797 F.2d 19, 28-29 (1st Cir. 1986). After

23

considering those factors, among others, the ALJ concluded that the evidence in the record was not consistent with plaintiff's testimony at the hearing that her pain greatly limited her daily activities.  (A.R. at 17).

After considering the entire record, the ALJ gave only limited credibility to plaintiff's allegations as to the level of her pain.  (A.R. at 15).  In making that finding, the ALJ cited evidence of improvement with treatment, the inconsistency between plaintiff's testimony and her RFC report, the medical opinions of treating doctors, as well as the assessments of her functional capacity given by state agency physicians.  (A.R. at 14-19).  Thus, the ALJ based his credibility evaluations on sufficient evidence and articulated specific reasons for doing so.  *Da Rosa*, 803 F.2d at 26.

Finally, plaintiff's contention that the ALJ did not consider the vocational experts' testimony at the hearing is not supported by the record.  The vocational expert stated that he did not believe plaintiff could work in a full-time basis in any occupation—but only when asked to assume that her description of pain were completely true. (A.R. at 46).  The ALJ concluded that plaintiff's descriptions of pain were not credible to the extent they were inconsistent with the medical evidence.  (A.R. at 15).  Therefore, the vocational expert testimony that plaintiff points to was based on a premise that the ALJ found to be at least partially untrue.

The ALJ considered plaintiff's allegations of pain before and after the surgery and supported his credibility evaluations with specific reasons for his findings.  He was within his discretion in giving those allegations limited credibility.  *Da Rosa*, 803 F.2d at 26.  Therefore, the ALJ did not err in his conclusion discounting plaintiff's complaints of pain.

**IV.**     <u>**Conclusion**</u>

For the foregoing reasons, the plaintiff's motion for an order to remand and reverse the

final decision of the Commissioner of the Social Security Administration is DENIED, and

defendant's motion for an order to affirm the decision of the Commissioner is GRANTED.

**So Ordered.**

                                  /s/ F. Dennis Saylor
                                  F. Dennis Saylor IV
                                  United States District Judge

Dated: July 25, 2014